### GATES v. BISSO FERRY CO. et al.*

### No. 16399.

Court of Appeal of Louisiana. Orleans.

March 8, 1937.

*Rehearing denied April 5, 1937.

Gordon Boswell, of New Orleans, for appellants.

Lewis R. Graham and Harry R. Cabral, both of New Orleans, for appellee.

McCALEB, Judge.

This is a suit by Mrs. Irene Bernius, widow of Charles Gates, on her own behalf and as natural tutrix of her two minor children against Bisso Ferry Company, Inc., Ocean Accident & Guarantee Corporation, Limited, its insurer, and Edwin, Alexander, and Joseph Bisso, individually, and in solido for damages for the death of her husband resulting from the alleged wrongful acts of the defendants.

Her petition alleges, in substance, as follows:

That, on November 9, 1933, Bisso Ferry Company, Inc., owned and operated the steam ferry boat Edwin N. Bisso, as a common carrier of passengers, across the Mississippi river between the head of Jackson avenue in the city of New Orleans and the city of Gretna, La., in accordance with certain franchises granted to it by the city of New Orleans and the city of Gretna; that on said date plaintiff's husband,

Charles Gates, boarded this ferry boat at Gretna, La., as a passenger for carriage to the New Orleans side of the Mississippi river and that he was received as such by the defendant Bisso Ferry Company, Inc.

She avers that, at the time her husband boarded said ferry boat, he was so intoxicated that he was physically and mentally irresponsible and incapable of taking care of himself; that his helpless condition was apparent to the employees of Bisso Ferry Company; that he was unattended by any person; and that the operator's servants and employees, knowing of her husband's condition, should have taken particular care of him, but that they failed in all respects to look after him and provide for his safety. It is charged that after the boat had completed its journey across the river, the employees of the operators permitted her husband to remain on the boat and make other trips thereon without doing anything to safeguard and protect him as a passenger; that, during one of said trips, while her husband was still a passenger and in an inebriated state, he fell over the side of said boat into the Mississippi river and was drowned; that, prior to the time when her husband fell into the river, defendants' employees did not safeguard against his falling and after he fell they failed to make any effort to save him; and that these employees had seen her husband in a drunken stupor situated on a bench directly opposite the passenger gate or passageway on the starboard side of said boat and allowed him to remain in such position unwatched, unattended, and unrestrained from walking to the edge of the boat. It is further averred that the drowning of plaintiff's husband was due solely and entirely to the negligence of the operators of the boat in failing to provide for his safety under the then existing circumstances, which were apparent to them, and that her husband's intoxicated condition imposed upon said operators the duty of administering special care and attention to him so as to prevent him from being injured.

The petition further charges that Edwin, Joseph, and Alexander Bisso are also responsible for the death of plaintiff's husband because they, by notarial act, bound themselves in solido to the city of New Orleans and the city of Gretna for the faithful performance by the Bisso Ferry Company, Inc., of its franchises and contracts with those cities, and that they have breached their contract in failing to provide for the safe carriage of plaintiff's husband.

Judgment is prayed for against all defendants in the sum of $30,260.

The defendants appeared and filed an exception of no cause or right of action and also an exception of misjoinder of parties defendants and of causes of action. The exception of no cause of action was overruled as to Bisso Ferry Company, Inc., and its insurer, but was sustained as to Edwin, Joseph, and Alexander Bisso. The exception of misjoinder of parties defendant and causes of action was likewise sustained as to the Bisso brothers, but the trial court refused to dismiss the suit as to all defendants.

Reserving the benefit of their exceptions, which had been overruled, the Bisso Ferry Company, Inc., and its insurer answered the petition and denied any liability in the premises.

The case then proceeded to trial before a jury. After hearing the evidence, a verdict was rendered in favor of plaintiff and against Bisso Ferry Company, Inc., in the sum of $6,000 and against Ocean Accident & Guarantee Company, Limited, the ferry company's insurer, in the sum of $5,000 (which is the limit of liability on the insurance policy). A judgment was entered on the verdict and both defendants cast therein have appealed suspensively to this court.

At the outset, appellants complain of the action of the lower court in that it failed to dismiss the suit as to all defendants, when maintaining the exception of misjoinder as to the Messrs. Bisso, and they cite Babineaux v. Miller, 5 La.App.(1st Cir.) 605, wherein it was said that "in a case of this character defendant is not bound to compel plaintiff to elect, and may ask the court to dismiss, and the court is even without power to discriminate in such a case by dismissing as to one party rather than another, but must dismiss as to all." Our attention is also called to the following expression of the Supreme Court in Davidson v. Frost-Johnson Lumber Company, 126 La. 542, 52 So. 759:

"Where an exception of misjoinder of defendants is sustained, the court cannot discriminate by dismissing the suit as to one defendant, rather than another, but must, ordinarily, dismiss it as to all."

See, also, McGee v. Collins, 156 La. 291, 100 So. 430, 34 A.L.R. 336.

Counsel for appellee counters with the case of Dubuisson v. Long, 175 La. 564, 143 So. 494, 496, wherein it was held that parties properly joined cannot complain of the improper joinder of others. In other words, "that an exception of misjoinder of parties defendant is personal to him who is improperly joined and is not open to those who are properly joined." The application of this later authority to this case is said to effect the necessary conclusion that the only parties improperly joined in this proceeding being the Bissos, who are not now before the court, the present defendants are without interest to urge the exception of misjoinder.

In Gill v. City of Lake Charles, 119 La. 17, 43 So. 897, it was stated that our Code of Practice makes no provision for the determination of the proper joinder of parties plaintiff or defendant and that there is nothing in the Spanish or French systems of procedure prevailing at the time of the adoption of our Code to guide us in the matter and that, therefore, we must look to the common law from which system our Code of Practice was largely derived. In Dubuisson v. Long, supra, the observations of the court in Gill v. City of Lake Charles are reaffirmed and a review of the common-law authorities undertaken, as a result of which it is asserted that the majority view supports the proposition that the objection of misjoinder of parties defendants is open only to a defendant who has been improperly joined. The two Louisiana cases previously decided by the Supreme Court and relied upon by appellants, McGee v. Collins and Davidson v. Frost-Johnson Lumber Company, supra, are distinguished by it in Dubuisson v. Long upon the ground that the exception of misjoinder in those cases was made on behalf of the parties who were not properly joined. We are impressed by the weight of the common-law authorities recognized by our Supreme Court in the Dubuisson Case, but it occurs to us that there must often arise cases in which the question (of determining which party is improperly joined) would present great difficulty. Be that as it may, however, we return to a consideration of the case before us.

■ The parties who have been joined as parties defendants are the Bisso Ferry Company, its insurer, the Ocean Accident & Guarantee Corporation, and the three Bisso brothers, Joseph, Alexander, and Edwin. As to the first two defendants, the cause of action is grounded upon a delict or tort. In view of the provisions of Act No. 55 of 1930, there can be no doubt of the right of the plaintiff to join the Bisso Ferry Company and its insurer in an action for the negligent killing of her husband. Plaintiff, however, has also joined as parties defendant Joseph, Alexander, and Edwin Bisso, asserting that they are also liable because they were sureties for the Bisso Ferry Company on its contract with the cities of New Orleans and Gretna, which contract was breached by the ferry company by the negligent drowning of one of its passengers, plaintiff's husband.

The basis of the alleged cause of action against the Bisso brothers arises ex contractu. Consequently, we have here a case in which there is a joinder of different causes of action against different parties defendant. It is contended that such a joinder cannot be defended upon the authority of Dubuisson v. Long, supra, because it is impossible to say which group of defendants should be held to answer the plaintiff's suit, there being as much reason to suppose that plaintiff relies as much upon her action ex delicto as she does upon her action ex contractu and vice versa. Some support is given this contention by the following declaration in Dubuisson v. Long, supra:

"The rule in Louisiana and elsewhere is that a plaintiff cannot in the same suit join different defendants 'in separate causes of action.'"

It is evident, however, from a reading of the opinion in the Dubuisson Case that the statement referred to must be considered in connection with the authorities cited with approval in the body of the opinion. We refer particularly to Riggs & Bros. v. Bell et al., 39 La.Ann. 1030, 3 So. 183, and to Neugass v. City of New Orleans et al., 43 La.Ann. 78, 9 So. 25, 26.

Riggs v. Bell, supra, was a case in which an exception of misjoinder was filed by all defendants in the case, some of whom had been sued on a contract and others on a tort. The suit had been brought against the plaintiff in an injunction suit for damages, the sureties on the injunction bond, and another party who was represented as having maliciously instigated the proceedings. In discussing the exception, the court said:

"It is therefore apparent that the defendants are all brought in on distinct causes of action.

"This would be sufficient to justify their objections, if these causes had not a cognate origin, and if the defendants had not a common interest to be adjudicated upon in one judgment. New Orleans Ins. Ass'n v. Harper, 32 Ann. 1165.

"It is clear that the plaintiffs had a right to two actions,—one on the bond, another on the tort; but in the exercise of the first right, they could not claim from the sureties more, than the amount for which they had agreed to make themselves liable by contract, in case the injunction was decided to have been wrongfully obtained.

"It is also clear that they could have joined in the same action the principal and the sureties, although more be claimed of the former than could be of the latter. Conery v. Coons, 33 Ann. [372], 373. * * *

"The defendants' sureties have a right to sever in their defense, but this they are not bound to do. This right has been more than once recognized. Arrowsmith v. Mayor, 17 La. [419], 421; Holzab v. New Orleans & C. R. Co., 38 Ann. [185], 187 [58 Am.Rep. 177]. But this is no reason why they cannot be brought in together to defend the suit where the causes have a cognate origin, and they have a common interest to be adjudicated upon. * * *

"In the present instance it is apparent that, if the defendants collectively and separately are liable, it is for causes which have a primitive source, namely, the wrongfully procuring and executing the injunction; that it matters little or not at all to them whether they can be held for the damages said to have been sustained because of a contract, or because of a tort, and that they have a decided interest in defeating plaintiffs' claim, for if they succeed in their defense, they will have shielded themselves from all future molestation."

Neugass v. City of New Orleans et al., supra, is a case in which separate causes of action may not be joined because defendants "have no interest in common to defend."

It is true that in Davidson v. Frost Johnson Lumber Company, supra, the court refused a request for a remand of the case in order that plaintiff might proceed against one of the defendants, saying:

"We should be disposed to adopt the suggestion as made, if it were practicable, but we do not find it so, since the judgment appealed from, holding that the suit is multifarious, like the exception on which it is based, has the same application to one group of defendants as to another, and as the trial judge could not have discriminated, by dismissing the suit as to one group and allowing it to stand as to the others, neither can this court so discriminate."

But as we have heretofore pointed out, the Davidson Case has been distinguished in the Dubuisson v. Long Case.

In Pierson v. Castell Land & Harbor Company, Inc., et al., 159 La. 158, 105 So. 274, 275, we find the following:

"After all is said, the trial has already been had, the matter was within the sound discretion of the trial judge, and we cannot say that he has abused that discretion. We cannot see where any one of the defendants has suffered any injury by being forced to defend the action along with his codefendants."

In Reardon et al. v. Dickinson et al., 156 La. 556, 100 So. 715, 717, the court, in discussing an exception of misjoinder, said:

"And this appears to be the rule followed in all of the cases we have been able to find. Where there is a common interest in the subject-matter of the suit, and where the cause of action arises from the same common source, joinder will be permitted; otherwise it will not. Holzab v. R. Co., 38 La.Ann. [185], 187, 58 Am.Rep. 177; Cane v. Sewall, 34 La.Ann. 1096; Conery v. Coons, 33 La.Ann. [372], 373; Riggs & Bro. v. Bell, 39 La.Ann. [1030], 1031, 3 So. 183.

"After all, the matter was within the sound discretion of the trial judge, and we are unable to say that he has abused that discretion. There is no pretense that the defendants have suffered any injury by the ruling complained of."

So, we say here that after all has been said and done no possible harm has resulted to the appellants in this suit, since they were not compelled to try their case below in conjunction with the three Bissos, whose exceptions of misjoinder and of no right or cause of action had been maintained and the case proceeded as one in tort against the alleged wrongdoer and its surety.

Our conclusion is that the action of the trial judge in refusing to dismiss the case as to all defendants, after sustaining the exceptions filed by the Bisso brothers, is not incorrect and, if any error was committed, it was harmless and without prejudice to the appellants.

We next consider the exception of no right or cause of action. It seems to us that the allegations contained in the petition are sufficient. It is charged that plaintiff's husband, to the knowledge of the operator's employees, was unattended in his drunken stupor and was situated in a position of danger on the ferry boat. If this be true, then, the employees of the carrier owed him the duty of administering particular care with regard to his safety, which the petition alleges they not only failed to provide, but that their delinquency in this respect proximately caused his death.

Passing on to the merits of the case, we find the facts to be as follows:

Gates, the deceased, was the operator of a taxicab. His usual station was at the Jackson avenue wharf in the city of New Orleans where he would transport persons leaving the Jackson avenue ferry to other parts of the city. On November 9, 1933, during the late part of the afternoon, he met a friend named Herman Haas and about 8 p. m. they crossed the Mississippi river on the ferry to Gretna, La., where they were to attend a dance. The deceased had on his person, at the time they went to the dance in Gretna, a pint of whisky and both he and Haas took several drinks out of the bottle. Haas testifies that he saw very little of Gates at the dance and that when he joined Gates at about midnight to go home, the latter was considerably inebriated. They left the dance around midnight and walked nine blocks to the ferry house, situated on the river bank at Gretna, La., where they waited for the ferry to transport them to New Orleans.

The ferry is a large boat, propelled by steam, with an engine house situated in the middle thereof. The decks are used to transport automobiles and passengers. The crew of the boat consists of a pilot, stationed in the pilot house in the upper tier of the ferry house, an engineer, whose duties require him to be in the engine room at all times, a deck hand, who unties the mooring ropes when the ferry departs and ties them when it is landed, and another employee who collects the fares from the automobiles using the ferry and also opens the passenger gates to allow passengers to board the ferry and disembark therefrom.

On the main deck of the ferry there are numerous seats, both on the starboard and port sides, adjacent to and connected with the engine room, which are for the use of passengers. Likewise, there are passenger seats in the stern of the boat connected to a four-foot railing which surrounds the outer edge of the ferry boat. This railing, between its elevation and the deck, is boarded up with planks so that it is impossible for any one to fall off the ferry either while the boat is in motion or while it is stationary. There are, however, four breaks in this railing which surrounds the ferry boat. Two of these are automobile gates situated on the starboard and port sides in the bow of the boat and are used by automobiles as a means of ingress and egress from the boat. When the boat is in motion, these automobile gates are closed by a large wooden bar which is inserted in a slot attached to the railing. The other two breaks in the railing are the passenger gates which are situated opposite each other on the starboard and port sides of the vessel near the stern. These gates consist of two iron bars operated through a slot connected to the railing and horizontal with it. The gates are always kept closed, except when the boat is landed for the purpose of taking on and discharging passengers, and the height of the top portion thereof, from the deck of the ferry, is three feet. There are two steps, situated on the deck of the ferry directly in front of the passenger gates, which are approximately seven inches each in height. The petition neither charges nor does the proof show that the ferry boat is defective in any manner, but, on the contrary, the craft is perfectly safe, being constructed and planned in accordance with government supervision and regulation and suitable for the purpose for which it is used. In the case of Johnson v. Bisso Ferry Co., 13 La.App. 159, 127 So. 661, in considering the type of boat which is involved in this case, we said:

"There seems to be no doubt that the boat in question was so constructed as to afford automobiles ample room to drive completely around the deck without coming dangerously near the seated passengers. In fact, the evidence shows that two cars may stand abreast between the outer rail of the deck and the seats in question without endangering or unduly crowding passengers on those seats."

Haas and Gates, at approximately 12:30 a. m., on November 9, 1933, boarded the ferry above described at the Gretna landing. Haas says that, at the time they got on the boat, Gates was helplessly drunk and that this fact was known to one Ulmer, an employee of the ferry company, whose

duty is to check the number of automobiles disembarking from the craft at the Gretna landing. Ulmer admits that Gates was staggering like a drunken man but says that he did not get close enough to him to smell liquor on his breath. Haas and Gates went upon the ferry and seated themselves on a passenger bench on the starboard side of the vessel. When the boat arrived at the Jackson avenue wharf, Gates was lying with his head on the passenger bench and at that time an employee of the ferry company named Chauffe, who collects the fares of the automobiles, came up and inquired of Haas whether Gates was sick or drunk. Haas says that he told Chauffe that Gates was drunk and that Chauffe shook Gates in an attempt to rouse him. At that time, Gates awakened and said to Chauffe, "Get away from me, you old s. b." A few moments later, while the ferry was still moored to the Jackson avenue wharf, Chauffe returned and Haas roused Gates again and tried to make him get off the ferry, but Gates told Haas to let him alone, that he was all right. At this time Haas informed Chauffe that he would leave Gates on the passenger bench and would endeavor to get some help. Thereafter, Gates remained on the passenger bench and some time during the early morning hours his presence was missed by Chauffe. Nine days later, his drowned body was found near the Julia street landing in the Mississippi river approximately a mile down the river from where the ferry boat operates. No one saw Gates leave the ferry boat, nor did any one see or hear him fall overboard.

■ The first question raised by counsel for appellants in this court is that the evidence adduced at the trial below is insufficient to support a finding that Gates met his death as a result of falling off the ferry boat. It is true that the proof presented is purely circumstantial, but that type of evidence may be considered in determining whether the death by drowning resulted from Gates falling off the ferry, and if it is such as to exclude any other reasonable hypothesis, other than that contended for by plaintiff, it will be adequate.

■ Reliance is placed by appellants in the cases of Bishop v. Town of Mansfield, 144 La. 109, 80 So. 217, Cannon v. Winnfield Oil & Gas Co., 4 La.App. 384 and Dowling v. T. P.-M. P. T. R. Co. (La.App.) 154 So. 65. Those cases were decided favorably to the defendants because it was found, upon the facts presented, that the circumstantial evidence adduced in proof of the accident or death was insufficient to exclude any other reasonable hypothesis but that the injury or death happened in the manner contended for. A mere statement of rule, respecting the weight to be given circumstantial evidence, reflects that each particular case must stand upon its own facts and hence no authority can be cited which will afford precedent in determining whether the evidence in the case to be adjudicated is either sufficient or insufficient. The uncontroverted circumstances, concerning the death of Gates, are: He was a drunken passenger on the ferry boat on the night of his disappearance. The last time any human being saw him alive, he was lying on a passenger bench on the starboard side of the craft where he had remained from the time he embarked until the time he disappeared. Chauffe, one of the ferry company's employees, who was in charge of the passenger gates, testifies that he did not see Gates leave the boat and for that matter no other person saw him leave. The body was found nine days later approximately a mile downstream from where the ferry operates.

■ In view of these facts, it is reasonable to presume that Gates either climbed over the rail or gate and fell off the boat into the water or that he jumped off the ferry, not realizing, because of his state of stupefaction, that he would be drowned. In either event, if the appellants owed him a duty of special care, because of the attending circumstances, they would be liable. It would be unreasonable, in light of the evidence, to hold that Gates had committed suicide as the record is silent of suggestion that he might have had a motive to end his own life, and the probabilities of murder are not justified. For these reasons, we find that the evidence reasonably sustains the conclusion that Gates' death by drowning was occasioned by his falling off or jumping off the ferry boat, which act, in either event, was directly due to his drunken condition.

■ Being of the opinion that Gates was drowned as result of falling or jumping off the ferry boat, we next consider the conduct of the vessel's employees in order to determine whether or not they were guilty of fault in the premises. Counsel for plaintiff remind us of the familiar doctrine that where an accident happens to a passenger, the burden of proof is upon the common carrier to show a freedom from fault. However, it must also be borne in mind that the carrier is not an insurer and

the burden cast upon it only requires it to exonerate itself from negligence and not to demonstrate the reason why the accident happened. See Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 97, 127 So. 376, and other cases.

Bearing in mind the doctrine of law above referred to, we observe primarily that, in the instant case, there is neither allegation nor proof that the accident which befell Gates was caused by reason of any defect in the ferry boat or because of any neglect concerning the operation of the craft. The gravamen of the charge of negligence here is not misfeasance on the part of the employees of the ferry company but nonfeasance, in that they (having observed Gates disabled mentally and physically by reason of excessive intoxication from alcohol) owed him a particular duty not imposed upon them with respect to other passengers in full possession of their mental and physical faculties. It is said that the duty of the carrier to Gates was one requiring special care and consideration and it, by the use of prudence, should and could have prevented him from either voluntarily or negligently injuring himself.

Counsel for appellants tacitly admits that the theory upon which plaintiff bases her action is not without precedent, but he contends that the special duty of care, which a carrier may owe to a drunken passenger, is imposed only when the passenger is unattended, and that, in the instant case, the evidence shows that Gates was in company with and assisted by the witness Haas.

■ It seems to be well settled that where a passenger is physically or mentally disabled and is attended by another person, apparently capable of rendering the needed assistance, there is no duty placed upon the carrier under such circumstances to render special attention to him. In 55 A.L.R. page 397, it is stated:

"Although a carrier may be under a duty to assist, in boarding or alighting, a passenger who is unable, through physical or mental disability, to care for himself, if such person is nevertheless attended by another person apparently capable of giving the needed assistance, the duty of the care is suspended, and voluntary assistance, at least, need not be proffered."

See, also, Southern R. Co. v. Hayne, 209 Ala. 186, 95 So. 879, Central of Georgia R. Co. v. Carlisle, 2 Ala.App. 514, 56 So. 737, Louisville & N. R. Co. v. Dyer, 152 Ky.

264, 153 S.W. 194, 48 L.R.A.(N.S.) 816, and Arnett v. Chesapeake & O. R. Co., 198 Ky. 491, 248 S.W. 1040.

The facts of the case reveal that, at the time Gates boarded the ferry, he was accompanied by Haas and that Haas cared for him during the journey across the river. After the boat landed, the ferry company's employee, Chauffe, inquired of Gates' condition and attempted to rouse him, with the result that Gates told Chauffe to let him alone and abused Chauffe by the use of an opprobrious epithet. At that time, Haas told Chauffe that he would get some help. Thereupon, Haas left the ferry and did not return. But counsel for plaintiff maintain that, notwithstanding this, Haas left Gates unattended on the ferry boat in a state of stupefaction, all to the knowledge of Chauffe, and they argue that during the period in which Gates was left unattended, the employees of the ferry company owed him the extra duty of care to protect him against injury. Assuming that counsel are correct in their analysis of the rules of law applicable, we shall examine the evidence in an attempt to discover in what manner the employees of the ferry company were derelict in the alleged special duty of care which was imposed upon them. It appears that, at the time Haas deserted Gates and went home, Gates was lying down on a passenger bench situated on the starboard side of the ferry opposite the passenger gate. We are told that it was extremely dangerous for Gates to be left lying in this position as it was inevitable that he, in his state of intoxication, would eventually wander to the passenger gate and fall into the river and that the employees of the ferry company should have recognized that such would be the case. Numerous authorities from common-law jurisdictions have been cited to show that where a carrier receives a drunken passenger for transportation, its employees are charged with a special duty of care to see that the passenger is not left in a dangerous position from which he may likely injure himself because of his inebriety. We are also told that our Supreme Court, in Horsthemke v. New Orleans Ry. & Light Co., 146 La. 931, 84 So. 210, has indicated the attention which should be given an intoxicated passenger.

■ The rule of law which counsel maintain is applicable here is well stated in Ruling Case Law, Vol. 4, § 595, and an analysis of the doctrine set forth therein warrants us in concluding that, generally

speaking, a common carrier is not bound to protect intoxicated persons from the consequences which might result from their own wrongs or follies. However, there may be responsibility where the carrier accepts the passenger, being aware of his intoxication, and either ejects him from the conveyance in a place of danger or allows him to remain, while on its conveyance, in a position where it could foresee that he might be hurt. The true test in determining liability is whether or not the carrier's employees were imprudent, and it therefore follows that each case must stand upon its own particular facts.

In the case of Horsthemke v. New Orleans Ry. & Light Co., supra, the plaintiff was ruthlessly ejected, while intoxicated, from a moving street car. The court held that, while the conductor was justified in expelling the plaintiff from the conveyance, because of his condition, nevertheless it was the employee's duty to have due regard for his safety, particularly if his condition of intoxication prevented him from taking care of himself. But there the facts exhibited that the plaintiff was injured as a result of being ruthlessly thrown off a moving street car, and affords no precedent for the conclusion the plaintiff would have us maintain in the matter now under consideration.

Much reliance is placed, by plaintiff, in the case of Fagan v. Atlantic Coast Line R. Co., 220 N.Y. 301, 115 N.E. 704, L.R.A. 1917E, 663. There the intestate, helplessly intoxicated, was a passenger on defendant's train. When the train arrived at the town in which he lived, he was escorted therefrom by the porter of the passenger coach. Instead of bringing the intestate into the depot, the porter placed him on a plank in an unlighted spot near the railroad tracks. He later wandered on the tracks and was killed by another train of the defendant company. The court held that it was negligence on the part of the railroad's employees, knowing of the intestate's helpless condition, to place him in a position of obvious danger where he might, due to his intoxication, go upon the railroad tracks.

That case is cited with approval in Veenstra v. United Rys. & Electric Co., 148 Md. 512, 129 A. 678. In the latter case, the plaintiff was ejected from defendant's car because he was drunk. The place where he was left by employees of the defendant was one of obvious danger and the court held, in remanding the matter for a new trial, that the evidence tendered was sufficient to go to the jury for it to determine whether the employees of the defendant were negligent in ejecting the plaintiff and, if negligent, whether such negligence was the proximate cause of injuries sustained by him in being struck by another car of the same company. The decision quotes, with approval, Mr. Elliot in his work on railroads (3d Ed.) § 2487, where, in speaking of the duty of care owed by a common carrier to intoxicated persons, it is said:

"If he is so intoxicated or so young or feeble as to be unable to take care of himself or to look out for his own safety, the company should exercise reasonable care to see that he is not expelled or abandoned in such a place or under such circumstances that he will be exposed to unnecessary perils."

To the same effect, see Panor v. Northwestern Elevated R. Co., 228 Ill.App. 162; Jameitis v. Wilkes-Barre Ry. Co., 277 Pa. 437, 121 A. 317; Donovan v. Greenfield & T. F. St. Ry. Co., 183 F. 526 (C.C.A.1) and Black v. New York, New Haven & Hartford R., 193 Mass. 448, 79 N.E. 797, 7 L.R.A.(N.S.) 148, 9 Ann.Cas. 485. In the last-named case, however, the syllabus of the court reads:

"Where a passenger in a car of a train of a railroad company is so intoxicated as to be incapable of standing or walking or taking care of himself in any way, semble, *that the conductor and brakeman of the train are under no obligation to remove him from the car when the train stops at his destination,* but, if they voluntarily undertake to help him from the car, they are bound to use ordinary care not only in the act of his removal but also in selecting the place in which to leave him." (Italics ours.)

We recognize that all of the foregoing cases reflect a correct conception of the law of negligence, but the evidence of negligence presented in those cases is vastly different from the circumstances attending in the case at bar, and, as we have above stated, in order to determine the question vel non of liability in this type of suit, each case must stand or fall upon its own particular facts.

Counsel for plaintiff erroneously assume, in oral argument and in their brief, that Gates was left in a position of obvious danger when he was allowed to remain on the passenger bench of the ferry after he had told Chauffe to leave him alone and

also, unwarrantedly, conceive that Gates' helpless condition was apparent to the employees of the ferry company. We do not believe that the evidence justifies such a finding as we shall hereafter demonstrate.

■ The record shows that no other employee on the ferry boat had anything to do with Gates except Chauffe, the automobile ticket collector. Chauffe, seeing Gates lying on the passenger bench, inquired of Haas whether the man was sick or drunk. When informed that Gates was drunk, Chauffee attempted to rouse him. His solicitation regarding Gates' welfare was rewarded by Gates telling Chauffe to let him alone "you old s. b." In view of the fact that Gates told Chauffe to let him alone in no uncertain terms (as is evident from the accompanying defamatory epithet), it is not plausible to us that Chauffc at any time believed that Gates was in a helpless condition. On the contrary, the attitude of Gates is indicative of belligerency. In fact, the logical impression to be derived from Gates' language is that he meant exactly what he said and that he needed no assistance from the employees of the ferry company or any one else. And, notwithstanding the fact that Gates was very drunk, can it be fairly said that Chauffe was derelict in his duty towards him by permitting him to remain upon the passenger bench of the ferry? We think not. The place where Gates was lying was not dangerous and it is unreasonable to assume that, in view of Gates' previous conduct, Chauffe should believe that he was physically and mentally helpless. It would be fallacious to hold that it was the duty of the employees of the ferry company to have a special guard or nurse to watch over Gates in order that he might be restrained from walking to the edge of the boat or to keep him from climbing over the passenger gate or railing and falling into the river.

In St. L., Alton & T. H. R. Co. v. Carr, 47 Ill.App. 353, it is said:

"The law does not impose the duty on a common carrier to place a guard over such passenger (intoxicated) to prevent him from injuring himself, or placing himself in a place of danger." (Word in parenthesis ours.)

See, also, Dabney v. Baltimore R. Co., 140 Ill.App. 269.

On the whole, the evidence in the case reveals to our satisfaction that the ferry company was without fault in the premises. Feeling as we do, recovery must be denied.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed and it is now ordered that there be judgment herein dismissing plaintiff's suit at her cost.

Reversed.